245 S.W.2d 37 (1951)
OLIVER
v.
OAKWOOD COUNTRY CLUB.
No. 42389.
Supreme Court of Missouri, Division No. 1.
December 10, 1951.
Motion for Rehearing or to Transfer to Denied January 14, 1952.
*38 Moss H. Silverforb, Kansas City, for appellant.
Spurgeon L. Smithson, Kansas City, for respondent.
Motion for Rehearing or to Transfer to Court en Banc Denied January 14, 1952.
VAN OSDOL, Commissioner.
This is an action for $15,000 for personal injuries. The action was instituted by William Oliver, plaintiff, an infant thirteen years of age, against defendant Oakwood Country Club (Oakwood Golf and Country Club), a corporation. At the conclusion of plaintiff's evidence the trial court sustained defendant's motion for a directed verdict and instructed the jury to return a verdict in favor of defendant. Plaintiff has appealed from the ensuing judgment.
Plaintiff had alleged,
"That defendant Oakwood Country Club * * * is and was at all times herein stated engaged in the business of owning and operating a golf course for hire to members of said club, and others, and among other activities employed, and kept upon its said grounds, a number of young boys to act as caddies, and for a consideration furnished them to its members and others, and invited, solicited, caused and permitted a large number of boys to congregate and gather at places designated by it * * * there to wait to be called by an agent and servant of defendant, known as a caddy master, without exercising ordinary care to supervise and protect said boys from injury by the acts and conduct of thoughtless and boisterous boys which it permitted to congregate at said place.
"That * * * plaintiff was employed by defendant as a caddy and directed to remain at a certain place upon the grounds of defendant until called by its caddy master; that at said time there was a number of other boys congregated at said place for said purpose; that while in said position, defendant * * * carelessly and negligently allowed and permitted another boy named Solomon Thorne Soloman (Solomon Thorne Flannigan) in its employ and so congregated, to have in his possession, an air pump gun shooting shot and other hard missiles, and to shoot same promiscuously in various directions in close proximity to plaintiff and others so congregated, and one of the shots struck plaintiff in the eye completely destroying the sight thereof; that defendant * * * knew or by the exercise of ordinary care could have known, that said boy had said gun upon its premises and was shooting same promiscuously * * * and was likely to injure plaintiff, in time thereafter, and before plaintiff was injured, to have prevented plaintiff from being injured, and negligently failed to do so; that defendant, its agents and servants were further negligent in permitting said boy to have said gun in his possession while upon said premises; that defendant, its agents and servants, were further negligent in failing to provide plaintiff a reasonably safe place to wait for a call from its caddy master, and in failing to have same supervised so as to keep it safe. * * *"
The plaintiff failed to prove facts as alleged in his petition. The plaintiff's evidence shows he had not arrived at the place designated for caddies to await a call for service, but there was evidence tending to show that plaintiff and four other boys had come from their homes to defendant's country club premises intending to present themselves for service as caddies; and that plaintiff was injured by one of the boys at a place in or near a wooded area some distance, fifty to one hundred fifty yards, from the caddie house belonging to defendant. The facts developed by plaintiff's evidence will be more particularly stated infra.
It is contended by plaintiff-appellant that the trial court erred in directing a verdict for defendant; that the petition should be considered as amended to conform to the *39 proof; and that plaintiff's evidence shows plaintiff was an invitee upon defendant's property and defendant had the consequent duty and failed in its duty to exercise ordinary care to keep its premises reasonably safe for plaintiff.
Defendant-respondent contends there was a total failure of proof of the claim as alleged in plaintiff's petition. Defendant-respondent urges there could be no recovery on the theory of an employer-employee relationship between defendant and the boy who shot plaintiff; the boy was not acting within the scope of his employment at the time plaintiff was shot, nor was the boy engaged in the furtherance of defendant's business; the petition should not be considered as amended to embrace another claim or cause of action founded upon duties incident to a proprietor-invitee relationship; and, moreover, defendant-respondent says, plaintiff's evidence was insufficient to make out a case on the theory that plaintiff was an invitee upon defendant's premises.
There was evidence introduced by plaintiff tending to show that defendant operates a golf course on land near Dodson in Jackson County. Young boys are employed as caddies by the golfers playing over the course. Defendant operates a "caddy bus" which moves over streets in Kansas City and Jackson County to gather and transport the boys to its country club property upon which is a caddie house where the boys are congregated to await the call for service by the caddie master.
Plaintiff had caddied ten or eleven times on defendant's course. "When you first went they would ask you are you coming back, or something. * * * When you go out there, Duke (defendant's caddie master), when you get the bag, asks you if you come back out the next time * * but when you go back out they begin to remember and they write it down."
In the morning of June 26, 1948, plaintiff and the four other boys boarded a bus at Twenty-seventh Street and Prospect Avenue in Kansas City and road to Seventy-fifth and Prospect. We infer that they expected to board the caddie bus at the latter point, but missed the connection, so they "all walked down and caught the Dodson street car." Sometimes they hitchhiked on down to Dodson. After they had arrived at Dodson they walked on Blue River Road until they came to a point east of defendant's property. West of this point, "it is along in up there," are "some woods like, it is on the caddy grounds. * * we go up throughthere is a path that leads up to the caddy house." The caddie house is "about a block or so" from the woods.
One of the boys, Rudolph, had an air gun wrapped in a newspaper. "He took it out when we almost got to the caddy shack, and he also shot the birds." Plaintiff first saw the air gun when the boys were going through the woods. They were going up the path leading from Blue River Road to the caddie shack. One or more of the boys saw Duke, the caddie master. "That is when Rudolph shot the bird and then he (Duke) looked over to see what he (Rudolph) was doing." Duke was walking from the clubhouse toward the caddie shack. He was facing towards the boys "for the moment * * * he was looking in my direction." Plaintiff testified that the boys were "about one hundred fifty yards or so" away when he first saw Duke, who "looked down" but "he didn't call out." Plaintiff also testified he was "one hundred fifty yards or one hundred fifty feet; I don't know" from the caddie house when the "shooting occurred." One of the boys testified that Duke was about seventy-five or eighty yards from the place where plaintiff was shot.
Solomon Thorne Flannigan, seventeen years old and one of the boys of the party, saw a blackbird and wanted to shoot at it, "so he asked could he use the gun and he got the gun from him (Rudolph)." Presentlyit "was about two or three minutes after Duke left * * * he (Solomon) asked did I (plaintiff) dare him to shoot me. I said: `No.' The next I knew he shot it. He said he thought he had the lock on it, that he didn't mean to do it, he thought the safety was on."
Plaintiff failed in showing that he and the other four boys of the party had reported at the caddie house for service as caddies at *40 the time plaintiff was injured. They had not congregated at the place designated to await the call of the caddie master, as plaintiff had alleged. At the time plaintiff was injured there was no shown employer-employee relationship between defendant and plaintiff which would impose upon defendant (as an employer) a duty to provide plaintiff with a safe place to work or to wait. And there was no shown employer-employee relationship between defendant and the boy Solomon which would require our examination of the evidence with a view of determining if defendant should be held responsible upon the principle of respondeat superior.
We now examine plaintiff-appellant's contention that there was substantial evidence introduced tending to show the relationship of proprietor or occupier of land and invitee obtained between defendant and plaintiff. We must further determine if the defendant had knowledge of the danger and the power and the consequent duty in the circumstances to control the conduct of the boy Solomon, a third person.
It has been said, "A bare licensee (barring wantonness, or some form of intentional wrong or active negligence by the owner or occupier) takes the premises as he finds them. His fix may be likened unto that of one who, buying lands, buys stones; or, buying beef, buys bones; or, borrowing a coat, takes it with holes in and buttons offthat is, in the use of his bare license he takes on himself the risk of perils from defects in the premises. Mere permission, without more, involves `leave and license,' but bestows no right to care. * * *
"But the situation, with reference to liability, radically changes when the owner invites the use of his premises for purposes connected with his own benefit, pleasure, and convenience. That change calls into play other rules of law, in order to do full and refined justice. The rule applicable to that change is that a licensee, who goes upon the premises of another by that other's invitation, and for that other's purposes, is no longer a bare licensee. He becomes an invitee and the duty to take ordinary care to prevent his injury is at once raised, and for the breach of that duty an action lies." Glaser v. Rothschild, 221 Mo. 180 at pages 185-186, 120 S.W. 1 at page 3, 22 L.R.A.,N.S., 1045; Porchey v. Kelling, 353 Mo. 1034, 185 S.W.2d 820; Twine v. Norris Grain Co., Mo.App., 226 S.W.2d 415. It is the rule that, in order to impose liability for injuries sustained because of defects or dangers on the inviter's premises, the condition must have been known to the inviter or must have existed for such time that the inviter should have known of it. The basis of the inviter's liability is his (superior) knowledge of an unsafe condition and its dangers. Hence, before liability is imposed, there must be actual or constructive knowledge of a dangerous condition. Lance v. Van Winkle, 358 Mo. 143, 213 S.W.2d 401; Robinson v. Great Atlantic & Pacific Tea Co., 347 Mo. 421, 147 S.W.2d 648; Casciaro v. Great Atlantic & Pacific Tea Co., 238 Mo.App. 361, 183 S.W.2d 833.
In the instant case there was evidence introduced from which it may be reasonably inferred that the five boys including plaintiff went upon the premises of defendant intending to enter defendant's service as caddies. In approaching the caddie housewhich we have inferred was the place designated for caddies to await the call for serviceplaintiff was passing along a pathway through a woods, which wooded area, it may be inferred, was a part of the grounds of defendant's country club property. It is true the only evidence tending to show that the wooded area was a part of defendant's property was plaintiff's own testimony that the woods "is on the caddy grounds." Plaintiff was not passing over defendant's premises as a bare licensee. There was evidence that defendant asked plaintiff and others, when they had once served as caddies on defendant's golf course, if they would return. "When you go out there, Duke, when you get the bag, asks you if you come back out the next time." It would seem reasonable to suppose plaintiff had been invited to return and seek employment as a caddie. The invitation apparently was not limited to those boys who were transported to defendant's premises by its caddie bus. Sometimes the boys "hitchhiked" down to Dodson and walked *41 up the path through the woods. It must be obvious that defendant in operating a golf course, whereon its members or patrons may wish the service of caddies, benefits by having caddies available for service. As we see it, plaintiff was not a bare licensee but was an invitee in a legal sensethe purpose of plaintiff's visit was a mutual interest, benefit or advantage to plaintiff and defendant.
The caddie master, Duke, should know that young boys do not have the discretion of adults, and, if he knew that one of the five boys approaching defendant's caddie house from the eastward had the possession of an air gun, it could be reasonably said the caddie master should have foreseen the situation was a dangerous one to defendant's members, patrons and employees, and to plaintiffan invitee upon the premises. It may also be reasonably inferred that, had defendant's caddie master known of the danger and had called out to the boys requesting them to surrender the possession of the gun, plaintiff would not have been injured. Although no one of the boys of the party, at the time plaintiff was injured, was defendant's employee and defendant had no right of control over any member of the party upon the principle of respondeat superior, yet defendant's occupancy of the premises charged upon it the affirmative duty to exercise ordinary care to keep its premises reasonably safe for invitees thereon. A defendant's possession may be sufficient to impose upon defendant, if present, the duty to control the conduct of a third person (other than an employee), for example, another invitee, when defendant knows or should know the exercise of his control of the third person is necessary to prevent harm. In re Sabbatino & Co., 2 Cir., 150 F.2d 101; Restatement, Torts, § 318; 65 C.J.S., Negligence, § 45c, pp. 533-534. See also Hughes v. St. Louis Nat. League Baseball Club, 359 Mo. 993, 224 S.W.2d 989, 16 A.L.R.2d 904; Id., Mo.App., 218 S.W.2d 632.
In the Sabbatino case, the administratrix of the estate of the intestate Camarda filed her claim against Sabbatino & Co., Inc., a bankrupt, for damages for the death of Camarda who was shot by Sabbatino, vicepresident of the company, at the company's office in the presence of Hoey, the company's principal managing officer. The company owned two guns which were kept in the company's safe in a room adjacent to the company's office. Claimant's decedent Camarda, a labor union official, had been invited to the company's office and there entered into a discussion of a compensation claim. Sabbatino, who was intoxicated and whose conduct had previously manifested a mental or nervous "trouble," went into the adjacent room and requested a gun from the company safe. Hoey heard Sabbatino make this request. When Sabbatino returned to the office with the gun in his possession and resumed his conversation with Camarda, the gun was displayed, twice discharged, and Camarda was fatally wounded.
The Sabbatino case [150 F.2d 105] is of interest to us here because of the precise bases upon which the reviewing court held the company was negligent. In view of Hoey's knowledge of Sabbatino's previous mental condition, as manifested by his previous conduct, and of his drunken state at the time when he asked for the gun, a reasonable man would have foreseen that Sabbatino, armed with a loaded revolver, since he might discharge it accidentally, would be a potential menace to everyone in the company's office. Said the court,
"On the facts thus viewed, we think the company was clearly negligent. It owed Camarda, an invitee, an affirmative duty to use due care to see to it that its premises were not in such condition as to put him in danger of physical harm. The company breached that duty when Hoey, its principal managerial officer, failed to prevent Sabbatino from obtaining possession of the gun. It is therefore immaterial whether or not Sabbatino, when he shot Camarda, was acting within the scope of his employment.
"We need not consider whether, as Sabbatino was a managerial officer, the company breached the duty to keep the premises safe through his possessing himself of the gun, when drunk, on the company's premises. Nor need we consider whether *42 liability could rest on the ground that the company entrusted its gun to a person known to Hoey, its president, to be in such condition that it might reasonably have been foreseen that the gun might be used to injure third persons."
In the Sabbatino case the evidence justified findings that Hoey knew Sabbatino had possession of the revolver and knew of Sabbatino's mental condition and his intoxication. A reasonable man might say Hoey should have foreseen the danger.
In the instant case it seems to us that the evidence, considered from a standpoint favorable to plaintiff, is of insufficient substantiality to support the conclusion that Duke, when Rudolph shot the bird, saw or was in a position to see the boys and to realize what they were doing. Plaintiff's evidence tends to show the boys, including plaintiff, were some distance away from the country club improvements when plaintiff was shot. They were in or had just emerged from the wooded area. There was direct evidence tending to show that Duke, the caddie master, in passing from the clubhouse to the caddie house, looked momentarily in the direction from which the boys were coming, and at a time when the boy Rudolph had shot the bird. There was evidence tending to show that, at the time Solomon shot plaintiff, the boys could have been seen by one at or back of the caddie shack; but there was no evidence that the boys were to be seen "two or three minutes" before when Duke "looked down" in the direction from which the boys were coming. The most that can be said isthere is a legitimate inference Duke's attention was momentarily attracted by the sound of the discharge of the air gun at the time Rudolph shot the bird, but, in the circumstances, it is difficult to indulge the further inference that Duke, hearing a sound, recognized the sound as the discharge of an air gun. Although there was evidence the boys could see and saw Duke look down at the time Rudolph shot the bird, this does not demonstrate that Duke then saw or could have then seen the boys and the gun, or that he knew or should have known that one of the boys had a gun in his possession. The circumstances shown by plaintiff's own testimony, that Rudolph had just shot a bird and that later Solomon saw and wanted to shoot a bird, tend to support the inference that the boys had not then moved entirely out into the clearing west of the wooded area. Now there was no evidence tending to show that defendant had ever theretofore permitted the possession or was apprised of any practice of the possessing or the using of firearms or air rifles by anyone in the woods or elsewhere on the country club premises. We believe the evidence leaves an essential element of plaintiff-invitee's case (that is, defendant-inviter's knowledge of the dangerous condition) wholly to conjecture.
Since we have come to the conclusion there was insufficient evidence introduced to support a finding of ultimate liability of defendant on the theory of an inviter-invitee relationship existing between defendant and plaintiff, and there is no indication that other evidence is available in support of such a theory of liability, it is neither necessary for us to consider the parties' contentions relating to the amendment of the petition, nor should we remand the cause for a new trial upon issues incident to a theory of an inviter-invitee relationship. Lance v. Van Winkle, supra.
The judgment should be affirmed.
It is so ordered.
LOZIER and COIL, CC., concur.
PER CURIAM.
The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court. All of the Judges concur.